1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11
**RANDY SCOTT SIMS,**

12
                                    Petitioner,

13
         **v.**

14

15
**AUDREY KING, Acting Executive
Director,**

16
                                    Respondent.

17

**Case No. 1:10-cv-02287 MJS (HC)**

**ORDER REGARDING PETITION FOR WRIT
OF HABEAS CORPUS**

18

19        Petitioner is involuntarily committed to Coalinga State Hospital as a sexually

20  violent predator (SVP) and proceeding pro se with a petition for writ of habeas corpus

21  pursuant to 28 U.S.C. § 2254. Respondent Audrey King, Acting Executive Director of

22  Coalinga State Hospital, is hereby substituted as the proper respondent pursuant to Rule

23  25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Lewis A.

24  Martinez of the office of the California Attorney General. Both parties have consented to

25  Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 7, 12.)

26  **I.       PROCEDURAL BACKGROUND**

27        Petitioner is currently committed to Coalinga State Hospital pursuant to a

28  judgment of the Superior Court of California, County of Fresno, following jury trial in

1    which, on March 16, 2009, a jury found to be true the allegations that Petitioner was a

2    SVP. (Clerk's Tr. at 263-64.) On March 17, 2009, the trial court ordered Petitioner

3    committed to Coalinga State Hospital. (Id.)

4         Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

5    District, which was denied on July 26, 2010. (Lodged Doc. 3.) The court affirmed the

6    holding of the trial court, except as to the commitment of Petitioner for an indeterminate

7    term. (Id. at 18.) The Court of Appeal remanded the matter back to the trial court to

8    determine the issues after the finality of the proceedings in People v. McKee, 47 Cal.4th

9    1172 (2010). Petitioner filed a petition for review with the California Supreme Court,

10   which was summarily denied on October 13, 2010. (Lodged Doc. 1; Pet. at 29.)

11        Petitioner filed the instant federal habeas petition on December 9, 2010. (Pet.,

12   ECF No. 1.) In his petition, Petitioner presents four claims for relief. Claim three of the

13   petition presents an equal protection challenge to his indefinite commitment.   That

14   challenge  was the subject of the remand by the California Court of Appeal. According to

15   the California Court of Appeal online docket, a second appeal was filed in the instant

16   matter on February 25, 2013, and it has yet to be adjudicated.

17        Respondent filed an answer to the petition on May 25, 2011. (Answer, ECF No.

18   13.) Petitioner filed a traverse on August 11, 2011 (Traverse, ECF No. 19.)

19   **II.    STATEMENT OF THE FACTS[1]**

20        **A. Background**

21           On direct appeal, the California Court of Appeal summarized as
22           follows:

23           On January 5, 1995, Sims pled to committing a lewd and lascivious
             act by force on a child under the age of 14, a violation of Penal Code
             section 288, subdivision (a), which is a qualifying prior under the SVPA.
24
25           On June 27, 2007, while Sims was at Wasco State Prison, the
             Fresno County District Attorney's Office filed a petition alleging that Sims
26           was an SVP and seeking to have him civilly committed. A jury trial

27   _____
     [1] The Fifth District Court of Appeal's summary of the facts in its July 26, 2010 opinion is presumed correct.
     28 U.S.C. § 2254(e)(1).

28

commenced on the petition on January 7, 2009, but a mistrial was declared on January 12.

A new trial commenced on March 4, 2009. Dr. Dawn Starr, a psychologist who had interviewed Sims in May 2007, testified at the trial. Starr determined that Sims had "fairly severe" developmental difficulties, a general mood disorder, and some psychotic problems. Starr diagnosed Sims as having nonexclusive type pedophilia, a qualifying mental disorder under the SVPA.

Starr based her diagnosis of pedophilia in large part on Sims's history. On April 2, 1984, at approximately the age of 16, Sims tried to force a seven-year-old boy to orally copulate him. On May 5, 1984, Sims took another seven-year-old boy into a basement, pulled down the victim's pants and underwear, massaged the victim's legs, and attempted to lie down on top of the victim. Sims was interrupted when two people happened upon the scene. Sims eventually admitted he took the victim to the basement to "fuck him."

In August 1984, when Sims was 16, he had intercourse with a seven-year-old girl several times and fondled the genitals of the girl's three-year-old brother. For these offenses, Sims was sent to the California Youth Authority and later to Napa State Hospital, where he remained until he was 23 years old. While at Napa State Hospital, Sims had sex with a 13-year-old girl and anal sex with a person who was in a body cast.

On August 31, 1994, Sims asked a seven-year-old girl to join him for milk and cookies. When she did, he pulled off his pants and underwear, attempted to pull off the girl's pants and underwear, and put his penis between her legs. The girl stated that on an earlier occasion Sims had cornered her in a stairwell, pulled down his pants, and rubbed his penis between her legs.

Sims also abused cocaine and had multiple parole revocations for using cocaine. The intellectual tests given to Sims indicated he was "mildly mentally retarded." Sims had some medical problems, including asthma and epilepsy.

Starr analyzed Sims's risk of reoffense using the Static-99 and Static-2002 actuarial tools. Sims's score on the Static-99 placed him in the high risk category; his score on the Static-2002 placed him in the highest risk category. Sims's risk factors included (1) multiple victims, other than the victim of the qualifying offense, (2) prior sex offenses, other than the qualifying offense, and (3) that the victims were unrelated.

Starr opined that Sims presented a serious and well-founded risk of reoffending in a sexually violent manner if released. Sims's age and medical issues would not prevent him from committing sexually violent offenses if released.

Dr. Carolyn Murphy, another psychologist, also evaluated Sims. Murphy diagnosed Sims as having pedophilia and a psychotic disorder not otherwise specified. The unspecified psychotic disorder was diagnosed because Sims exhibited some hallucinations and some false beliefs about his body. Murphy also concluded that Sims had a personality disorder with antisocial traits.

In addition to the Static-99 and Static-2002 tests, Murphy evaluated Sims using the MnSOST-R (Minnesota Sex Offender Screening Tool-Revised), another actuarial tool that looks at different factors than the other two tests. Murphy opined that Sims presented a serious and well-founded risk to reoffend in a sexually violent manner because of the predatory crimes he had committed, the actuarial risk assessment, he previously had violated community release, and he had not completed sex offender treatment.

A third psychologist, Dr. Michael Musacco, also evaluated Sims. Musacco's diagnosis agreed with the other two psychologists -- pedophilia. Musacco also found that Sims's intelligence was in the low borderline range and that Sims had a cocaine dependence. Musacco administered the three actuarial tests and found that Sims scored at or above the high risk range on each of the three tests. Musacco opined that Sims was at high risk of reoffending.

Sims presented testimony from a clinical psychologist, Dr. Raymond E. Anderson. Anderson did not see evidence of a psychotic disorder. Anderson opined that Sims was not a pedophile and that there were no indicators that he was unable to control his behavior. Anderson opined that Sims's risk of reoffense was about five percent and Sims did not present a serious risk of reoffense.

Dr. Jules Burstein, a clinical and forensic psychologist, also evaluated Sims. Burstein found that Sims had a depressive disorder and cocaine dependence, which was in remission. He concluded Sims did not have a mental disorder that predisposed him to commit sexual offenses. Sims was depressed because he had been "locked up a long time" and wanted to be released.

Burstein did not agree with the diagnosis of pedophilia. Burstein opined that statistical tests were "fraught with difficulties." Burstein opined that Sims would be at low risk for reoffending if he participated in substance abuse treatment and sex offender treatment after release.

David Purvis, who has a master's degree in social work, was the director of a nonprofit institute. Purvis provided counseling in various areas, including domestic violence, substance abuse, anxiety disorders, and sex offender counseling. Sims had expressed an interest in Purvis's program. Purvis felt he could work with Sims and that Sims would be an "interesting challenge."

Sims's younger brother, Michael, testified that he had a great relationship with Sims and trusted him around his young son and niece. He also trusted Sims around other people's children. Michael was willing to see that Sims registered as a sex offender and that he attended sex offender and substance abuse treatment. Michael and Sims planned to move to Texas to be near an aunt and uncle once Sims was released.

LaNell Williams operated facilities for sex offenders. Sims previously had been in one of Williams's facilities for about a year. Williams was willing to work with Sims again.

Sims testified on his own behalf. Sims was "very sorry for what [he had] done to [his] victims." He claimed he never fantasized about sex with

children. He was in phase one of sex offender treatment at the state hospital when his treatment was interrupted by the trial. He wanted to move to Texas and testified he would behave himself in Texas.

On March 16, 2009, the jury found Sims was an SVP. The trial court ordered Sims committed for an indefinite term.

People v. Sims, F057352, 2010 Cal. App. Unpub. LEXIS 5820, at *2-*8 (Cal. App. 2010).

## III.    DISCUSSION

### A.    Pending State Proceedings

As the challenged state proceeding is still being adjudicated, this Court must abstain from granting relief based on abstention grounds, under Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). Under principles of comity and federalism, a federal court should not interfere with ongoing state criminal proceedings by granting injunctive or declaratory relief absent extraordinary circumstances. Id. at 43-54. The rationale of Younger applies to non-criminal proceedings when important state interests are involved. See Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982); SJSVCCPAC v. City of San Jose, 546 F.3d 1087, 1092 (9th Cir. 2008). Younger abstention is required when (1) state proceedings, judicial in nature, are pending; (2) the state proceedings involve important state interests; and (3) the state proceedings afford adequate opportunity to raise the constitutional issue. Middlesex, 457 U.S. at 432. A fourth requirement has been articulated by the Ninth Circuit: that "the federal court action would enjoin the state proceeding or have the practical effect of doing so, i.e., would interfere with the state proceeding in a way that Younger disapproves." SJSVCCPAC, 546 F.3d at 1092 (citing cases).

The rationale of Younger applies throughout appellate proceedings, requiring that state appellate review of a state court judgment be exhausted before federal court intervention is permitted. See Huffman v. Pursue, Ltd., 420 U.S. 592, 607-11, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (1975). Moreover, a petitioner who intends to seek federal habeas corpus relief must await the outcome of his state court appeal before doing so;

1    that appeal may result in reversal of the petitioner's conviction on some other ground,

2    thereby mooting the claims raised in his federal habeas petition. See Sherwood v.

3    Tomkins, 716 F.2d 632, 634 (9th Cir. 1983) (citations omitted).

4         Here, Petitioner has filed a mixed petition that includes an unexhausted equal

5    protection claim. Upon remand, the state trial court was charged with reconsidering

6    Petitioner's challenge to the constitutionality of his civil commitment once McKee is

7    decided. The state proceedings in McKee, and application of the outcome of McKee to

8    Petitioner's case, involve the important state interest of regulating the detention of

9    SVPs. Those proceedings, as well as California's habeas process, afford an opportunity

10   for Petitioner to raise his constitutional challenge. Further, adjudicating the present

11   petition would interfere with the Court of Appeal's directive to the trial court to reconsider

12   Petitioner's equal protection challenge and the Court of Appeal's direct review of that

13   determination.

14        While the present petition is not presently ripe for review, the Ninth Circuit has

15   instructed that in such instances, dismissal is not appropriate prior to providing

16   Petitioner an opportunity to stay the proceedings. Henderson v. Johnson, 710 F.3d 872,

17   874 (9th Cir. 2013) ("Although district courts cannot adjudicate mixed petitions,

18   Sherwood does not undermine the important precedent requiring district courts first to

19   grant leave to amend and, if requested, to consider a petitioner's eligibility for a stay.")

20        **A.    Standards for Granting a Stay**

21        A court may stay a petition and hold it in abeyance pursuant to either Kelly v.

22   Small, 315 F.3d 1063 (9th Cir. 2002), or Rhines v. Weber, 544 U.S. 269 (2005). See

23   King v. Ryan, 564 F.3d 1133, 1135 (9th Cir. 2009). Kelly and Rhines set out different

24   procedures and requirements for imposing a stay. Under Kelly, the petitioner amends

25   his petition to delete any unexhausted claims. The court then stays and holds in

26   abeyance the amended, fully exhausted petition, allowing the petitioner the opportunity

27   to proceed to state court to exhaust the deleted claims. Id. (citing Kelly, 315 F.3d at

28   1070-71.) Later, the petitioner amends his petition to add the newly-exhausted claims to

1     the original petition. Id. Under Rhines, a petitioner must meet three pre-conditions for a

2     stay of a mixed petition: (1) a finding of good cause for petitioner's failure to exhaust all

3     his claims before filing his habeas action; (2) a finding that the unexhausted claims are

4     potentially meritorious; and (3) no indication that the petitioner engaged in intentionally

5     dilatory tactics. Rhines, 544 U.S. at 278. If all three preconditions exist, the court should

6     stay the habeas case and hold it in abeyance, leaving the mixed petition intact while the

7     petitioner returns to state court to present his unexhausted claims.

8           Rhines does not go into detail as to what constitutes good cause for failure to

9     exhaust, and the Ninth Circuit has provided no clear guidance beyond holding that the

10    test is less stringent than an "extraordinary circumstances" standard. Jackson v. Roe,

11    425 F.3d 654, 661-62 (9th Cir. 2005). Several district courts have concluded that the

12    standard is more generous than the showing needed for "cause" to excuse a procedural

13    default. See, e.g., Rhines v. Weber, 408 F. Supp. 2d 844, 849 (D.S.D. 2005) (applying

14    the Supreme Court's mandate on remand). This view finds support in Pace v.

15    DiGuglielmo, 544 U.S. 408, 125 S.Ct. 1807, 161 L. Ed. 2d 669 (2005), where the

16    Supreme Court acknowledged that a petitioner's "reasonable confusion" about the

17    timeliness of his federal petition would generally constitute good cause for his failure to

18    exhaust state remedies before filing his federal petition. 544 U.S. at 416-17.

19          However, in Wooten v. Kirkland, 540 F.3d 1019 (9th Cir. 2008), the Ninth Circuit

20    ruled that petitioner did not show good cause by arguing that he was "under the

21    impression" that his counsel had raised all claims before the state court of appeal.

22    Wooten, 540 F.3d at 1024. The Ninth Circuit explained that finding good cause in that

23    argument "would render stay-and-abey orders routine" and "would run afoul of Rhines

24    and its instruction that district courts should only stay mixed petitions in 'limited

25    circumstances.'" Wooten, 540 F.3d at 1024.

26          Here, it is unclear if Petitioner could make the required showing of good cause

27    for a stay under Rhines. However, the Kelly procedure, which has remained available

28    even after the Supreme Court's ruling in Rhines, does not require a showing of good

1  cause. <u>King</u>, 564 F.3d at 1140. The Court must still deny a request for a stay and

2  abeyance under <u>Kelly</u> if the new claims are facially without merit and therefore cannot

3  be added to the existing habeas petition after they are exhausted in state court. <u>King</u>,

4  564 F.3d at 1141.

5      The Court notes that it is questionable whether Petitioner's unexhausted claim for

6  equal protection presents, at this stage, a facially meritorious claim. Upon remand the

7  state court in <u>McKee</u> found that the disparate treatment of SVP's did not violate

8  McKee's equal protection rights. <u>People v. McKee</u>, 207 Cal. App. 4th 1325, 1348 (Cal.

9  App. 2012) ("We, like the trial court, conclude the disparate treatment of SVP's under

10  the Act is reasonable and factually based and was adequately justified by the People at

11  the evidentiary hearing on remand. Accordingly, we conclude the Act does not violate

12  McKee's constitutional equal protection rights.") Other California Courts of Appeal have

13  likewise agreed. <u>See</u> <u>People v. McDonald</u>, 214 Cal. App. 4th 1367, 1380 (Cal. App. 4th

14  Dist. 2013); <u>People v. Landau</u>, 214 Cal. App. 4th 1, 48 (Cal. App. 2013); <u>People v.</u>

15  <u>McCloud</u>, 213 Cal. App. 4th 1076, 1086 (Cal. App. 2013); <u>People v. McKnight</u>, 212 Cal.

16  App. 4th 860, 864 (Cal. App. 2012). Of course, this Court shall refrain from addressing

17  the merits of such claim, as required by <u>Younger</u>. However, the Court desires to place

18  Petitioner on notice of issues that he may address should he request a stay from this

19  Court.

20      Accordingly, Petitioner is hereby ordered within thirty days to notify the Court

21  should he request a stay of the present mixed petition to exhaust state court remedies,

22  or whether Petitioner wishes to withdraw the sole unexhausted claim, claim three, and

23  proceed with the remaining claims.

24  **IV.   CONCLUSION AND ORDER**

25      Accordingly, it is ORDERED that:

26  1. Petitioner must either file: (a) a motion to stay the proceedings, or (b) notice of

27  intent to withdraw his unexhausted claim within thirty (30) days of the date of

28  service of this order.

8

2. Petitioner is forewarned that failure to comply this order will result in dismissal of the petition pursuant to Local Rule 110.

IT IS SO ORDERED.

Dated:   July 29, 2013                        /s/ *Michael J. Seng*
                                    UNITED STATES MAGISTRATE JUDGE